Messrs. Condy and Franklin, *pro quer.*
Mr. S. Levy, *pro def.*


# *Reuben Mitchell, plaintiff in error, *against* [*84 · David Smith.

[The report of Mr. Binney not containing the able argument of Judge SMITH, that argument is here supplied.]

S. C. 4 Dall. 1 Binney, 110.

SMITH, J. By the statement in the record, it appears, that the contract on which the plaintiff below (the defendant in error) founds his action, and which the defendant below (the plaintiff in error) contends is null and void, was entered into on the 11th March 1796; and that the single bill, on which the plaintiff below contends he ought to recover, was given for lands in Smithfield township, in Luzerne county, out of the seventeen townships, which lands had been granted to him by the committee of the Susquehannah company, agreeably to a resolve of the said company.

Or in other words, that the plaintiff below sold to the defendant below, lands within this commonwealth, as the consideration of the single bill aforesaid, to which lands he had no title or claim, but in opposition to its· laws; and he calls upon its courts to enforce his demand, founded on such opposition. If on the principles of law he is entitled to recover, the court is bound to assist him, and will assist him, be the consequence what it may; but unless we are satisfied that he is entitled to such recovery on the established principles of law, we are compelled to resist his demand; for it is a maxim in our law, that a plaintiff must shew that he stands on a fair ground, when he calls on a court of justice to administer relief to him.   6 Term Rep. 409.   3 Term Rep. 456.   It must not appear from his own shewing that he has infringed the laws of his country.   It is a rule, that those who come into a court of justice must come with clean hands, and must disclose a transaction warranted by law.   3 Term Rep. 422.

To enable us to judge whether the plaintiff below stands on ·fair ground or not, we must examine and keep constantly in our view the act of assembly passed the 11th April 1795, just eleven months before this transaction.   The two first sections have been already read, from 3 St. Laws, 703.

1. I will first consider the transaction under this act, as if the act of 6th April 1802 (5 St. Laws, 198) had not been made; because the law knows of no contracts but what are good or

bad, at the time of the contract made, and not to be the one ot the other, according to a subsequent contingency. *Per cur.* 10 Mod. 67. 2 Equ. Ab. 679. 2 Ves. 423. 1 Atky. 404. 2 Equ. Ab. 511. 1 Fonbl. 122.

The first section of the law of 1795, does not bear directly on the question before us; but consequentially it does apply, as affording \*a strong reason why the plaintiff below ought not to recover on this contract, as I shall shew hereafter.

\*85]

The cause was so ably and ingeniously argued on both sides, and the principle is so important, that I have deemed it incumbent on me to examine carefully the numerous authorities, which were cited on each side. By that examination, I am convinced that the counsel had taken great pains to search for and arrange the principal cases, which apply to each side of the question. Every thing which ingenuity could suggest, was said in favour of the original plaintiff's demand.

It is laid down by the counsel for the plaintiff below, and it is certainly sound and settled law, " that where a statute appoints " a penalty for the doing of a thing, which was no offence before, " and appoints how it shall be recovered, it shall be punished by " that means, and not by indictment." Cro. Jac. 674. 1 Show. 398. See all the cases in Leach's note.

" That where new created offences are only prohibited by the " general prohibitory clause of an act of parliament, an indict- " ment will lie; but where there is a prohibitory particular clause " specifying other particular remedies, there such particular " remedy must be pursued; for otherwise the defendant would " be liable to a double prosecution, one upon the general prohi- " bition, and the other upon the particular specific remedy." 1 Burr. 544.

" If a new offence is created by statute, and a special juris- " diction out of the course of the common law, is prescribed, it " must be followed, or all is a nullity." Cowp. 544, 650. *Per* Lord MANSFIELD.

Were this an action of debt brought against an offender against either section of the act for the penalty, these cases which were cited and argued from, and many others to the same point which might be cited, would clearly apply. So they would, were any attempt made to inflict either of those penalties in any other manner than that prescribed by the act; but I confess, I cannot see their application to the case before us, which is simply, whether a party acting in violation of a law of the state, and being liable to the penalty inflicted by it, shall have the aid of this court, in carrying such act into execution, or not ?

It was contended, that the court ought to enforce the demand of the original plaintiff, because the transaction was no offence at common law; that the act of assembly only imposes a penalty on it, but does not declare it void. This position was much relied on. I reply to it in the words of Ld. Chief Justice HOLT, which have already been repeated from Carth. 252. 5. Vin. 507.

The ingenious counsel in support of the original plaintiff's demand, feeling the force of this opinion, as directly in point and *conclusive against his client, thinks he avoids its force, by saying that it is only a *dictum*. It is so, but it [*86 is a *dictum* of Lord Chief Justice HOLT, and has never been contradicted to my knowledge. As applied to the case before us, it seems to me unanswerable.

Cases may occur in which the legislature may inflict a penalty, or in other words, lay a duty on contracts between individuals, of a nature affecting only themselves, and having no influence on the public welfare. Such contracts may be entered into without breach of moral or political duty; and if so, they ought to be enforced, if the party claiming the benefit of them pays the duty or penalty, or becomes liable to pay them, this being in fact matter of contract between such parties and the legislature.

Is the contract in question a contract of this nature? If it be, it is our duty to carry it into execution. Before we can say, whether it be such a contract, it is necessary that we examine it first on general principles; and secondly, in its consequences, natural and necessary, not merely contingent.

The date, cause, and consideration of it, have been stated already. Should it be enforced by law? The present intruders being first settlers, are, like all other first settlers on frontiers, not men of affluence or influence. That they have settled in direct opposition to the will of the state, that they found their claim under another state, is apparent on the record, and taken for granted in the argument.

Is it therefore against the principles of sound policy? For many contracts which are not against the rules of morality, are still void, as being against the maxims of sound policy. *Per* Ld. MANSFIELD. Cowp. 39, 200. If the act is in itself a violation of the general laws of public policy, there the party paying shall not have an action for money had and received. Dougl. 672.

Bond for the purchase of an office, though not within the stat. of 5 and 6 Edw. 6, yet a perpetual injunction was granted; Ld. Chancellor THURLOW treating it as a matter of public policy of the law, and similar to marriage brocage bonds, where the practice is publicly detrimental. 1 Bro. Cha. Rep. 124–5. 1 Fonbl. 214.

This case is an answer to the argument derived from 2 Wils. 133. In 7 Ves. jr. 473, is a strong case, though it was not cited at the bar; that the plaintiff could not recover, because he claimed through the medium of an illegal agreement, although it was only contrary to a regulation of the East India Company.

Contracts are void, if they are either repugnant to the welfare of the state, Co. Lit. 216. b., or against some maxim or rule of law, or in contradiction to some positive statute. 1 Pow. Con. 166. Therefore all bonds, contracts, and agreements, which

4 YEATES—6

*have for their object a restriction of trading in general throughout England, are void, as militating against national policy, Ib. I Wms. 182, 185, whether with or without consideration, Ib. 187, 190, by reason of the mischief which may arise from such restraints to a man and his family by the loss of his livelihood, and to the public by depriving it of an useful member.

Marriage brocage bonds are void, because they militate against the general welfare of society.   I Pow. *Contra.* 174–5.   3 Lev. 411.   15 Vin. 265.   Show. P. C. 76.   I Cha. Rep. 87.   I Fonbla. 253–4.   Forrest. 132.   Not for the particular damage to the party, but from considerations of public policy.   Cowp. 343. It is not for the sake of the defendant that the objection is allowed, but it is founded on general principles of policy.   I Atky. 352.

There is another series of cases, in which it has been adjudged upon the same principle, that a party to the contract cannot have the assistance of courts to carry it into effect, it being repugnant to the welfare of the state.   In the first case, Cowp. 341, the plaintiffs, foreigners, sold at Dunkirk the tea, for the price of which the action was brought, to the defendant, as they would to any other person, and in the ordinary course of their trade, knowing it was intended to be smuggled by him into England, but having no concern in the smuggling scheme itself. The plaintiff recovered.   Why?   Because the plaintiff was a foreigner, not bound to take notice of the revenue laws of England ; the contract abroad was complete in the ordinary course of trade, and the plaintiff had no concern in the smuggling scheme.   Had any of these circumstances been the reverse, the *plaintiff would not have recovered.*

Then follow the cases of Biggs *v.* Lawrence, 3 Term Rep. 454 ; Clugas *v.* Penaluna, 4 Term Rep. 466 ; and Waymell *v.* Reed *et al.,* 5 Term Rep. 599, which have been already mentioned.

These last three cases do indeed recognize that of Holman *v.* Johnson, Cowp. 341, but by refined discriminations they almost explain away its effect ; because, scarcely one seller out of one hundred, who does not contribute in some degree (and even tying an extra rope around the cask, for instance, will be sufficient to prevent his recovery) in facilitating the views of the smuggling purchaser, when the transaction is understood between them.   And all smuggling is not *malum in se.*   3 T. R 422.   Cowp. 343.   Nor do any of the acts of parliament, in flicting penalties, some of them very severe, even death on smugglers, declare contracts void, because the goods were sold for the purpose of smuggling, and the seller assisted in the smuggling.

*88]      *This act of assembly, inflicting a penalty on this transaction, proves that it is illegal.   Were the court to assist the parties to carry this contract into execution, the consequences would, in the nature of things, be, that such first intru-

[Mitchell, Plaintiff in error, v. Smith.]

ders as I have described, would sell to others of more wealth and influence, who would be tempted by the lowness of the price, at which such first intruders, conscious of their want of title, would be induced to sell, to make large purchases of the pretended rights, and form such a formidable phalanx against the clear title of the state, as to produce a civil war. Whereas if such contracts be void, if they cannot be carried into execution, the right of the state will ultimately prevail. It would prevail now, were it not for a very few individuals, whose personal and political importance depends upon their continuing the champions of that opposition, which they began, and which they think it dishonourable to relinquish. Their sons will be at liberty to think, and act for themselves, with unfettered minds.

I am therefore of opinion, that this contract is repugnant to the welfare of the state, to sound policy, and that neither party can resort to the laws of the state, to assist him in carrying it into execution. If either party be entitled to the assistance of the laws of the state to execute such contract, the laws ought equally to assist the other party. Now suppose that on this contract, the seller had conveyed to the purchaser, had received the whole of the consideration money, and refused to deliver up the possession, could the purchaser, claiming the land in opposition to the title of the state, recover in ejectment ? If he could not (and it will not be alledged that he could) this is a conclusive reason against a recovery by the original plaintiff, in the case before us, were all the other cases out of the question. But independent of this reason, each class of the cases which I have stated, would be sufficient for the reasons stated in them, to prevent a recovery by the original plaintiff on this contract.

This last class applied so pointedly against the recovery by the original plaintiff, that his able and ingenious counsel was compelled to relinquish all reasoning on the merits, and resort to the observation, that all revenue cases in England, bend the laws till they almost break ; and he gave the instance in 7 Term Rep. 601. When that case was first cited in this court, I in pointed terms expressed my disapprobation of its extent, nor am I yet reconciled to it. But our learned, ingenious and candid brother does not say, that any law was bent in the cases which I have cited, which almost independently govern the case before us. For it is not alledged, that any of the acts inflicting penalties on all smuggling transactions, declare any of the contracts *for goods purchased, for the purpose of smuggling to be void. The decisions are grounded on principles of public policy alone. [*89

It is indeed said by a great judge, upon a very remarkable occasion, that courts must not regard political consequences. 4 Burr. 2562. But it is well known to every well read lawyer, to almost every man of learning in Britain and in the United States, that the only fault ever imputed to that excellent judge, was, that he paid too much regard to political consequences, in his judicial

[Mitchell, Plaintiff in error, v. Smith.]

capacity. It is perhaps because I venerate his transcendent abilities, that I never have been able to discover the justice of the imputation. Nor is it necessary on this occasion to discuss the point. Because the same great judge, after twelve years more experience, says, if the question had been doubtful, arguments from utility and public convenience, ought to have turned the scale. Doug. 597. He had the preceding years, declared, that upon principles of law, conveniency and sound policy, the action in question would not lie. Ib. 573.

Another great judge, Lord Chancellor HARDWICKE, equal to Lord MANSFIELD, greater he could not be, declares, that "these "reasons of public benefit and convenience weigh greatly with "me, and are a principal ingredient in my present opinion." 3 Atky. 16.

The same ornament of the English bench, seven years afterwards, in a cause of very great importance indeed, so great that he called to his assistance the chief justice of England, the chief justice of the Court of Common Pleas, the master of the rolls, and the eminent judge BARNET, who all concurred in judgment; declares, "that political arguments in the fullest sense of the "word, as they concern the government of a nation, must and "have always been of great weight in the Court of Chancery; "and though there may be no *dolus malus* in contracts as to other "persons, yet if the rest of mankind are concerned as well as the "parties, it may be properly said, that it regards the public util- "ity.". 1 Atky. 352.

If there ever was a case, in which political arguments ought to have great weight, if ever, were the case even doubtful, arguments from utility and public policy ought to turn the scale, if upon principles of law, conveniency and sound policy, the original plaintiff ought not to prevail, this is that cause, perhaps more emphatically so than any other cause which ever came before any court in this state.

Here a number of people from another state, called intruders in the language of the legislature, have in combination taken possession of lands within this state, the property of its citizens, and hold these lands in defiance of its laws; and yet those violated laws are applied to, to aid the violaters in carrying into *effect their contracts respecting the property, for which *90] its citizens have paid their money, to enable the intruders to increase their influence and force, so as to bid defiance to the state. That this is their aim, he must be an idiot who can doubt. The man of understanding, who can affect a doubt, must be a knave; and yet forsooth, the laws of the state must assist those, who hold lands in opposition to the grants of the state, to transfer their pretensions to others; who can more effectually oppose the rights of those, whom the state is under the most solemn obligation to defend and protect!

I might rest here on this point: but because next to the duty of administering justice between the litigant parties, is that of

convincing the losing party, that the whole case has been examined and considered by the court, (6 Term Rep. 408,) I will take notice of some other cases, on which some reliance has been placed by the counsel of the original plaintiff. The chief of which is Robinson *v.* Bland, 2 Burr. 1077. But it does not apply; because that part of the contract on which the plaintiff recovered, was warranted by the laws of France where it was made, and by the laws of England, where it was to be performed.

Cowp. 734, was cited to prove, that where parliament says, you shall not wager or insure in certain cases, you may wager or insure by implication in cases not prohibited specially, although these last cases where you are at liberty to wager or insure, may be contrary to the act of parliament : but it does not seem to me, that the book warrants the position ; and if it were warranted, it would not apply to the case before us.

The case in 1 Bos. and Pull. 3, would apply if the assured had sued the underwriters.

2. I now proceed to consider, whether the act of 6th April 1802, (5 St. Laws 198) has any, and if any, what influence on this contract. This act is relied on greatly by the counsel for the original plaintiff, who says, this act clearly expresses the sentiments of the legislature, that the contract was not before void ; that it required that act to make it void ; and that it is a question of state policy, not of judicial construction. I will examine each of the points.

The preamble states, "whereas certain persons, under the "pretence of title derived either from the state of Connecticut, "or from certain Companies known by the names of the Connect- "icut Susquehannah Company and the Connecticut Delaware "Company, to a considerable extent of territory within this state, "have by various improper practices, long endeavoured to defeat "the execution of the laws of this state, and to defame titles of "persons holding lands by grants from the state, or the late "* proprietaries before the revolution, in order therefore "to counteract such practices, and to preserve the just [*91 "rights of this state," &c.

The 1st section declares, that no conveyance after the 1st May 1802, made of any land within Luzerne, Lycoming, and Wayne counties, shall be good or effectual to pass any right, &c. unless, &c., and it inflicts a penalty on the judge or justice who shall take an acknowledgment or proof of such deed, and a penalty on the recorder who shall record it.

The 4th sect. inflicts a penalty on any person, who shall after the 1st June 1802, bargain, sell, or convey, or by any ways or means obtain, get, or procure any pretended right or title, or make, or take any promise, contract, grant, or covenant, to have any right or title of any person in or to such lands, &c., and "such promise, contract, grant, or covenant is thereby declared "to be utterly void, and of none effect."

Had there been nothing more in this act, there would be con-

siderable force in the remark, that it would or might amount to a legislative construction or declaration, that such contract was not void before.

Courts ought to pay, and always will pay great attention and regard to legislative constructions; but they are not conclusive, for if they were, the legislative would become also the judicial power.

It is asked, "if the intrusion law reached this case to avoid "the contract, would the last law have been made? Besides, "this last law was not in force as to vacating the contract, till "the 1st May, and as to the penalty, not till the 1st June after "the passing of the act; which affords strong evidence, that "until such time as the people of Luzerne county should have "notice of the law, such contracts, which might even be made "in the mean time, were not void."

In answer to the question, permit me to repeat the words of Lord MANSFIELD. Cowp. 434. The principles and rules of the common law, as now universally known and understood, are so strong against fraud, in every shape, that the common law would have every end proposed by the statutes 13 Eliz. c. 5, and 27 Eliz. c. 4, though the former relates to creditors only, the latter to purchasers. And yet although these two statutes were not really necessary, they always had been held in high estimation. And the same great judge declares, that they cannot receive too liberal a construction, or be too much extended in suppression of fraud.

It is well known, that commerce and mercantile credit consequent on it, were rapidly increasing just at the time that these *statutes were enacted; the frauds incident, and to a degree peculiar to such transactions, no doubt increased in the same proportion.

*92]

Judges generally are, and frequently ought to be cautious, in applying the principles of the common law to new subjects. Some of them might and probably did express doubts, how far those principles were sufficient to suppress the mischief, which the legislature seeing daily growing, removed the doubts at once: and the statutes aforesaid, though really not necessary, probably prevented much of the growing evil. So may the last act of our legislature prevent many men from entering into the combinations, which have long proved, and which always will prove, while they exist, so dangerous to the peace, and so destructive of the prosperity, improvement and happiness of that part of the state.

General principles of law and reason would thus apply in giving construction to the law of 6th April 1802, and in judging of its influence in the construction of the preceding act, were there no proviso in the act of 6th April 1802. But when we read this proviso, "That nothing herein contained shall be so "construed as to make valid any conveyances, heretofore made 'of any pretended title or claim to land under the colony or

"state of Connecticut, or either of the companies, known by "the names of the Connecticut Susquehannah, or the Connecti- "cut Delaware Company," the implied legislative construction contended for is expressly guarded against. This act therefore, so much relied on, if it has any operation on the case before us, is certainly not in favour of the original plaintiff's demand.

As to contracts made between 6th April 1802 and 1st May and 1st June respectively, they remain exactly as if this last act had not been made.

It is asked, may not the possessor devise this land? May it not descend? May it not be taken in execution, and the purchaser from the sheriff hold it till recovered by a Pennsylvania title?

I answer that neither the devisee, nor the heir, nor the purchaser from the sheriff can have the aid of the courts in this state, to recover land claimed in opposition to the right of the state. The consequence in the last instance will be, that no person will trust the intruder.

It is also said, that the conscience of the original defendant cannot support him in this defence; that on this contract he has obtained possession, on which he alone can obtain a warrant for the land; that he is not ousted; that no Pennsylvania title appears; and that on this possession he can maintain trespass. I reply: that true it is, that as to land for which there is no office *right, the possessor has the right of pre-emption; but he must pay the state for the land. Now, here it was [*93 not the possession alone which the original defendant bought, but the title to the land.

But on this contract he has obtained the possession, and all the benefits accompanying it, and therefore he ought to give it up, or pay for it according to his contract, as understood by both parties. Were judges the keepers of the consciences of the parties to every suit, (we are eased of a great burthen in not having that duty imposed on us) there would be great weight in the observation; but this agreement, which the court cannot for the reason before stated, assist in carrying into effect, "may "perhaps be fit to be executed by the parties, but can only be "enforced by considerations which apply to their feelings. The "law encourages no man to be unfaithful to his promise; but "legal obligations are, from their nature, more circumscribed "than moral duties." 1. H. Bla. 327–8. *Per* Ld. LOUGH-BOROUGH.

The parties are looked upon to treat together, as if there were no law about the matter, and so to renounce the benefits which might accrue by the law to either of them. 1 Pow. *contra* 201.

I concur in opinion, that the judgment below should be reversed.